# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ISABELLA PERKINS,

        Plaintiff,

v.

UNIVERSITY OF PITTSBURGH OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, and TORY VERDI, an individual,

        Defendants.

Case No. 2:26-cv-219

**COMPLAINT**

Filed on behalf of Plaintiff, Isabella Perkins

Counsel of Record for this Party:
Keenan Holmes, Esquire (PA ID #204520)

**JURY TRIAL DEMANDED**

Ebony Law, LLC
213 Smithfield Street
Pittsburgh, PA 15222

Phone: (724) 263-7530
Email: kh@ebonylaw.com

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ISABELLA PERKINS, | : Case No. 2:26-cv-219 |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| UNIVERSITY OF PITTSBURGH OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION, and TORY VERDI, an individual | : |
| | : |
| | : |
| | : |
| Defendants. | : |

## COMPLAINT

### Introduction

1.     Plaintiff Isabella Perkins ("Plaintiff" or "Ms. Perkins") brings this civil rights action against Defendants the University of Pittsburgh ("Defendant" or "University") and Head Coach Tory Verdi ("Defendant Verdi" or "Verdi") for violations of her rights under 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972, and related state common law causes of action. This case arises from systemic emotional, psychological, and physical abuse inflicted by Defendant Verdi within the University's women's basketball program, abuse that was both enabled and perpetuated by the University's willful disregard of complaints, institutional red flags, and the deteriorating well-being of its student-athletes.

2.     Ms. Perkins was subjected to a hostile, discriminatory, and retaliatory environment that undermined her athletic development, compromised her academic progress, and deprived her of the full educational benefits of her scholarship. Defendant Verdi, acting both

under color of state law and in his official coaching capacity, weaponized his authority to manipulate, demean, and emotionally destabilize players, including Ms. Perkins, through targeted mistreatment, verbal abuse, gaslighting, and retaliatory conduct.

3.     This Complaint addresses multiple violations of Ms. Perkins's constitutional and statutory rights, including retaliation for protected conduct, deliberate indifference to an abusive and unequal environment, denial of due process in connection with her removal from the team, interference with her eligibility for a medical redshirt, and severe emotional and psychological harm.

4.     Ms. Perkins seeks redress for the significant and long-lasting harm she suffered due to the unlawful actions of both Defendants, harm that was preventable, well-documented, and caused by the University's and Defendant Verdi's collective failure to uphold their obligations under federal and state law.

## Jurisdiction And Venue

5.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 because this action arises under federal law, including 42 U.S.C. § 1983 and Title IX, 20 U.S.C. §§ 1681-1688.

6.     This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the University is located in this District and a substantial part of the events giving rise to the claims occurred here.

## Parties

8.    Ms. Perkins is an individual and a former student-athlete who enrolled at the University of Pittsburgh on an athletic scholarship to participate in the NCAA Division I women's basketball program.

9.    Defendant University is a public university and recipient of federal funding operating educational programs, including the women's basketball program, governed by Title IX and constitutional law.

10.    Defendant Verdi is the Head Coach of the University of Pittsburgh's women's basketball program.

11.    Upon information and belief, Defendant Verdi resides in the Commonwealth of Pennsylvania.

12.    At all times relevant to this Complaint, Defendant Verdi was acting under color of state law in his capacity as an employee, supervisor, and representative of the University.

13.    Defendant Verdi is sued in his individual capacity for acts taken within and beyond the scope of his employment that violated Plaintiff's constitutional rights, caused emotional harm, and contributed to a hostile educational environment in violation of federal law.

## Factual Allegations

### Scholarship and Initial Recruitment

14.    Plaintiff Isabella Perkins is a collegiate student-athlete who was recruited by the University of Pittsburgh to play for its women's basketball team beginning in August 2023.

15.    Ms. Perkins was recruited by Head Coach, Defendant Verdi, and his staff, with promises of an inclusive, empowering team environment where her leadership and talent would be respected and supported.

16.     As part of her recruitment, Plaintiff was awarded an athletic scholarship, providing tuition, room and board, and other educational benefits tied to her participation in the program.

17.     This scholarship formed part of a binding agreement governed by NCAA rules, institutional policies, and state and federal law.

***Hostile Environment and Sex-Based Discrimination Under Title IX***

18.     Plaintiff relied on the University to provide a lawful and supportive environment that allowed her to participate in intercollegiate athletics without fear of retaliation or discrimination.

19.     Under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688, Defendant University had both a statutory and regulatory obligation to prevent and respond to sex-based discrimination, including the creation and perpetuation of a hostile educational, playing, and work environment through verbal, emotional, and/or psychological misconduct.

20.     Beginning in Fall 2023, Plaintiff was subjected to repeated, severe, and objectively offensive conduct by Defendant Verdi, which altered the conditions of her education and athletic participation and created a hostile environment based on sex.

21.     The abuse included, but not limited to, public humiliation, verbal degradation, arbitrary reductions in playing time, exclusion from team activities, favoritism of other players, manipulation of player statistics, and inappropriate commentary regarding Plaintiff's physical appearance, emotional state, and performance.

22.     Defendant University, through its coaching staff and administrators, knowingly created and maintained a psychologically abusive and emotionally volatile environment within

the women's basketball program that posed a foreseeable and escalating risk of harm to Plaintiff and other players.

23.    Plaintiff, a scholarship student-athlete under the control and direction of the University, was required to operate in a team culture that was coercive, degrading, and emotionally destabilizing.

24.    Plaintiff was routinely humiliated, mischaracterized, and pressured to perform under conditions that prioritized fear and manipulation over development and well-being.

25.    Despite clear signs of Plaintiff's deteriorating mental health and obvious red flags concerning Defendant Verdi's behavior, the University failed to intervene, supervise, or provide any meaningful protections.  This inaction directly increased Plaintiff's exposure to harm.

***Coach Verdi's Pattern of Emotional Abuse, Psychological Manipulation, and Discriminatory Conduct***

26.    Upon arriving at the University, Ms. Perkins quickly observed that the environment within the women's basketball program was starkly different from what was promised.

27.    Defendant Verdi exercised near-total control over the daily athletic, academic, and psychological experiences of the women's basketball team.

28.    Through his role, Defendant Verdi was entrusted with the care, development, and well-being of student-athletes.

29.    Defendant Verdi used his position of authority to engage in emotionally abusive conduct, retaliation, and psychological manipulation that transcended poor coaching and entered into constitutional violations.

30.     Under Defendant Verdi's leadership, the program was defined by fear and emotional volatility as players were routinely demeaned, psychologically isolated, and pressured to perform under abusive conditions.

31.     Defendant Verdi fostered a culture of public shaming and arbitrary punishments by maintaining a rigid and controlling atmosphere in which players were discouraged from speaking up and punished if they did.

32.     Plaintiff and her teammates individually and collectively witnessed and experienced patterns of emotional mistreatment.

33.     These actions were not isolated or incidental, rather they reflected a broader pattern of psychological abuse carried out under the pretext of coaching.

34.     Defendant Verdi's disparate treatment extended beyond just individual comments.

35.     After a practice during the 2023-2024 season, Defendant Verdi told the team, "Every night I lay in bed I want to kill myself because of you." This shocking statement, made by a figure in power, caused fear, emotional distress, and confusion among players, and contributed significantly to the emotionally abusive environment that permeated the program.

36.     Defendant Verdi's comments combined with his conduct created a pervasive sense of anxiety and unease that compromised the players' mental health as well as academic and athletic performance.

37.     Players were made to be afraid to make mistakes or voice concerns because those who did were retaliated against through exclusion, loss of playing time, or verbal reprimand.

38.     Defendant Verdi's individual actions, decisions, and omissions played a direct and substantial role in the deprivation of Ms. Perkins's rights under federal and state law.

39.     Defendant Verdi would frequently belittle players' appearance, mock their personalities, and accuse them of being "bad people," further eroding morale and self-worth.

40.     Ms. Perkins and her teammates were also subjected to inappropriate political commentary by Defendant Verdi, who would launch into political diatribes during team meals, singling out players and making them uncomfortable.

41.     On one occasion, Defendant Verdi also directed xenophobic and culturally insensitive remarks toward international players. During a pregame meal before the team played Clemson University, he told an international student-athlete to "go back home because ICE is coming," a deeply alarming and offensive statement implying immigration enforcement action.

42.     These statements, made in front of teammates and in official team settings, fostered a climate of fear, humiliation, and exclusion, particularly for international athletes, further contributing to the hostile and psychologically unsafe environment within the women's basketball program.

43.     The team environment became so toxic that players began to express feelings of hopelessness and emotional withdrawal as this was not merely a "tough coaching style," but a sustained and harmful pattern of emotional misconduct.

44.     During the 2023-2024 season, during a gathering amongst players, a freshman player posed the question to her teammates, "is it possible we are being abused [by Defendant Verdi]?"

45.     Ms. Perkins, who had dealt with past trauma and mental health challenges, was especially vulnerable to this toxic culture.

***Institutional Knowledge, Deliberate Indifference, and Failure of Oversight***

46.     Despite clear signs of distress among players, Defendant University failed to intervene or provide any meaningful support, oversight, or protective measures.

47.     At the end of the 2023–2024 season, Ms. Perkins attended an end-of-year meeting with Defendant Verdi.

48.     In that meeting, Defendant Verdi acknowledged that he had not treated Ms. Perkins the same as other student-athletes and assured her that the next season would be different. Ms. Perkins reasonably relied on this representation in continuing with the program.

49.     Also at the end of the 2023–2024 season, other players participated in exit interviews with Jennifer Tuscano, the Assistant Athletic Director for Defendant University and the administrator responsible for supervising Defendant Verdi.

50.     During these exit interviews, players made complaints to Ms. Tuscano about the conduct of Defendant Verdi, his treatment of players and the hostile environment he created.

51.     More specifically, another player, Gabriella Hutcherson, was told she no longer had a place on the team, Jennifer Tuscano contacted Ms. Hutcherson via text message and requested a meeting with her and Heather Lyke, the University's Athletic Director.

52.     Ms. Tuscano specifically asked Ms. Hutcherson to meet to discuss her experience within the program and Defendant Verdi's first year as Head Coach.

53.     Ms. Hutcherson met with Ms. Tuscano and Athletic Director Lyke for approximately one and a half to two hours.

54.     Ms. Hutcherson was candid, detailed, and direct regarding the hostile, abusive, and retaliatory environment Defendant Verdi created.

55.     Ms. Hutcherson explained that Defendant Verdi's conduct and the University's failure to intervene were the reasons she was leaving the program.

56.    This meeting placed Defendant University, at the highest levels of athletic administration, on actual notice of Defendant Verdi's misconduct.

57.    Despite this notice, Defendant University failed to initiate an investigation, impose corrective measures, or provide any remedial support.

58.    No interim protections were offered, and Defendant Verdi was allowed to continue coaching without restriction.

59.    Defendant University's inaction constituted deliberate indifference under Title IX.

60.    Defendant University had a duty to exercise reasonable care in the hiring, retention, and supervision of its athletic personnel, including Defendant Verdi, the Head Coach of the women's basketball program.

61.    At the time of hiring and throughout his tenure, Defendant University either knew or should have known that Defendant Verdi exhibited a pattern of emotionally abusive coaching tactics, retaliatory behavior, and discriminatory treatment of players. His behavior raised numerous red flags that were visible to athletic administrators, support staff, and other members of the University community.

62.    Despite multiple reports from Plaintiff, other players, and their families regarding Defendant Verdi's conduct, including verbal and emotional mistreatment, threats of retaliation, psychological manipulation, and inappropriate commentary, the University failed to intervene, investigate, or take any meaningful disciplinary action.

63.    Defendant University failed to properly vet Defendant Verdi's history prior to his hiring, and after his appointment, failed to monitor his coaching practices or respond to escalating complaints. This institutional inaction created a foreseeable risk of harm to

student-athletes, particularly vulnerable individuals like Plaintiff who were dependent on their scholarships and athletic status for academic and professional advancement.

64.    This pattern of negligence in hiring, oversight, and response directly enabled the hostile and retaliatory environment that ultimately caused Plaintiff substantial harm. She suffered long-term emotional trauma, disruption of her education, damage to her athletic and professional trajectory, and reputational harm.

65.    Defendant University had actual knowledge of Defendant Verdi's misconduct, including reports made by Plaintiff, her teammates, other coaches from the staff, and the parents of student-athletes.

66.    Throughout the season, several players shared similar experiences of mistreatment with administrators and even the coaching staff, which placed the University on notice of systemic issues within the program.

67.    Despite this notice, Defendant University failed to take timely or effective corrective action.

68.    Defendant University did not conduct a formal investigation, did not offer interim measures, and allowed Defendant Verdi to continue coaching without restriction, thereby exhibiting deliberate indifference.

69.    Defendant University allowed the culture of silence, control, and fear to fester and continue, violating Plaintiff's constitutional and statutory rights.

***Escalation of Gender-Based Misconduct and Discriminatory Treatment (2024–2025 Season)***

70.    During the 2024-2025 season, Defendant Verdi doubled down on his antics and abusive behavior.

71.    During the summer of 2024, in a private meeting with Ms. Perkins, Defendant Verdi made a deeply inappropriate and gender-based comment, stating, "I don't like you as a player, but I'd let my son date you."

72.    This remark, made in a professional context by a person in authority, was not only demeaning and irrelevant to Ms. Perkins athletic role, but also indicative of the gendered lens through which Defendant Verdi evaluated and treated his players. Rather than assessing Ms. Perkins's value based on her skill or leadership, Defendant Verdi objectified her and reduced her worth to her physical attractiveness.

73.    The comment was not only unwelcome, offensive, inappropriate and demeaning, but emblematic of the discriminatory and hostile environment cultivated by Verdi and reinforced a pattern of gender-based hostility that contributed to Plaintiff's sense of emotional distress, isolation, and diminished self-worth.

74.    On another occasion, Defendant Verdi regularly mocked a player's appearance and made inappropriate comments about her weight.  More specifically, when that player gained weight during recovery from an injury, Defendant Verdi made comments such as, "You look pregnant," in front of other players.

75.    Plaintiff and her teammates repeatedly noted that male athletes at the University were not subject to such hostile environments or comments and did not face similar retribution for expressing concerns or underperforming.

76.    No comparable complaints had emerged from men's teams, and no action was taken when women raised persistent issues.

77.    This disparity led Plaintiff and others to conclude that women athletes, particularly those who were outspoken, were uniquely subjected to judgment, ridicule,

punishment or exclusion. The University's failure to act in the face of clear gender-based mistreatment deepened the perception of unequal protection.

78.     Consistent with the broader pattern of emotional manipulation described above, Defendant Verdi repeatedly shifted explanations about roles and performance, gaslighting players and distorting reality to maintain control.  More specifically, he implemented erratic and manipulative tactics, including the so-called "practice cauldron," in which he fabricated performance statistics to arbitrarily discredit Plaintiff.

### Teammate Reports and Failed Institutional Response (2024)

79.     During the 2024-2025 academic year, Defendant University received additional, specific, and escalating notice regarding the hostile and abusive environment created by Defendant Verdi within the women's basketball program.

80.     Players, parents, and staff members continued to raise similar concerns with administrators and Human Resources.

81.     More specifically, throughout the 2024-2025 season, Brooklynn Miles, a teammate of Plaintiff, made good-faith efforts to seek support and intervention through internal University channels, including repeated communications with Jennifer Tuscano, the Assistant Athletic Director and administrator responsible for supervising Defendant Verdi.

82.     Ms. Miles maintained text-message communications with Ms. Tuscano throughout the season whenever there were instances of verbal abuse, bad treatment, or escalation of the hostile environment.

83.     Ms. Miles's communications were contemporaneous, specific, and made in good faith with the expectation that the University would provide oversight, protection, and corrective action.

84.    Ms. Tuscano traveled with the team and, at all relevant times, had direct access to and awareness of the women's basketball environment and Defendant Verdi's conduct.

85.    Notably, Ms. Tuscano came to observe certain practices and was well aware of the hostile environment created by Defendant Verdi.

86.    Players on the team reasonably believed Ms. Tuscano served as a liaison or advocate capable of elevating player concerns to higher-level administrators and influencing oversight and accountability.

87.    Ms. Miles also voiced concerns directly to Defendant Verdi during the season in his office, in good faith, attempting to address the atmosphere and the treatment occurring within the program.

88.    Ms. Miles further raised concerns to Laurel Gift, a University representative, regarding the program environment and Defendant Verdi's conduct.

89.    Ms. Miles also raised concerns to Assistant Coach John Marcum, who was aware of the hostile environment and the impact it had on players.

90.    Ms. Miles's repeated disclosures placed Defendant University on actual notice of ongoing misconduct within the women's basketball program, including verbal and emotional mistreatment, intimidation, and a psychologically harmful environment.

91.    Despite receiving multiple reports, Defendant University failed to intervene, investigate, or impose meaningful discipline.

### *Internal Reports, Failed Institutional Response, and Retaliatory Escalation (Fall 2024)*

92.    Ms. Perkins was told she would be a leader on the team and was praised for her performance during preseason training.

93.     That praise quickly gave way to silence and exclusion once Ms. Perkins began expressing concerns about the culture and treatment of players.

94.     Early in the 2024-2025 season, Ms. Perkins and her family made good-faith efforts to seek redress through internal University channels, including meeting with athletic department staff and Title IX-adjacent resources.

95.     In early October 2024, Ms. Perkins met with Defendant University's representative Ms. Tuscano, who was believed to serve as a liaison or advocate capable of elevating player concerns to higher-level administrators.

96.     Ms. Tuscano traveled with the team and was a witness to Defendant Verdi's actions and the hostile environment he created.

97.     Ms. Perkins, relying on Ms. Tuscano's perceived role, communicated her experiences and frustrations to Ms. Tuscano in good faith, expecting some level of support or intervention.

98.     In late October 2024, Ms. Perkins and her parents met with representatives of Defendant University who worked in the athletic department and shared their concerns relative to Defendant Verdi, his conduct, and his treatment of Ms. Perkins.

99.     Additionally, a former coach, Coach John Marcum, went to Defendant University's Human Resources department, the Assistant Chancellor and Ms. Tuscano, to report Defendant Verdi for the hostile environment he had created and provided substantial details.

100.    Ms. Perkins's efforts, as well as Coach Marcum's complaint, were ignored and even discouraged, and failed to result in any meaningful corrective action.

101.    More concerningly, Ms. Perkins's attempts to raise concerns were met with retaliatory behavior from Defendant Verdi, who, upon learning of Ms. Perkins's outreach

intensified his mistreatment through exclusion, targeted comments, and ultimately, removal from the team.

102.    On one occasion, Defendant Verdi pitted the white players on the team against the black players on the team, claiming that players "hung out" with other players who shared the same race.

103.    Defendant Verdi used this as an opportunity to single out Ms. Perkins, and stated during a team meeting that Ms. Perkins was in the "middle" because although she was white, she seemed to prefer to hang out with the black players.

104.    Notably, Defendant Verdi was directly confronted by one player who accused him of being a racist because of how he dealt with black players on the team.

105.    When confronted, Defendant Verdi told the player who complained some of her teammates were not "good" people and they were lucky to still be on the team.

106.    Defendant Verdi further responded by calling a team meeting, during which he challenged whether the players even knew the definition of racism.

107.    The cumulative impact of these experiences caused Ms. Perkins to suffer severe anxiety, depression, and mental exhaustion.

108.    As a result of Defendant Verdi's actions, Ms. Perkins continued treatment with a licensed therapist.

109.    Players, parents, and even a now-former assistant coach, Coach Marcum, raised complaints to Defendant University.

110.    No corrective action was ever taken against Defendant Verdi and there was no investigation into his conduct by Defendant University.

111.    Over time, many players, including Ms. Perkins, experienced a growing sense of hopelessness as their attempts to raise legitimate concerns were met with silence or inaction.

112.    In mid to late October 2024, Ms. Perkins voiced her concerns directly to Defendant Verdi and other coaches and staff about the atmosphere that was created.

113.    Despite playing through visible pain from multiple injuries, including a serious back injury, Ms. Perkins was routinely denied adequate medical care and forced to compete under worsening physical conditions.

114.    When her injuries escalated and she confided in the team doctor about the hostile and abusive environment perpetuated by Coach Verdi, her protected disclosure triggered swift retaliation.

115.    Instead of receiving support, Ms. Perkins became the target of intensified mistreatment, culminating in her removal from the team shortly thereafter.

### *Retaliatory Removal from the Team*

116.    On December 3, 2024, the same day she made her complaints known, Defendant Verdi abruptly dismissed Ms. Perkins from the team without warning or cause.

117.    The dismissal of Ms. Perkins from the team was carried out without proper notice, due process, or adherence to athletic department or NCAA policies.

118.    Ms. Perkins was never formally notified that she had been dismissed or removed from the team, but her name and image were removed from the team's website and promotional materials and she was not permitted to dress for games.

119.    Ms. Perkins had not committed any conduct violations, missed practices, or failed to meet team expectations.

120.    The removal was purely retaliatory and designed to humiliate and isolate Ms. Perkins from the team community because she reported Defendant Verdi.

121.    These actions were taken despite Ms. Perkins having eligibility and having signed a 2024-2025 participation agreement (the "Participation Agreement").

122.    Notably, the day she was kicked off the team, Ms. Perkins went to the office of Coach Marcum to see if she could get any answers as to the reason, but Defendant Verdi walked in and interrupted that meeting and called Ms. Perkins a "joke" and told her to leave the building immediately.

123.    Ms. Perkins then contacted Ms. Tuscano to inform her of the situation.

124.    Initially, Ms. Tuscano seemed concerned, but no action was taken against Defendant Verdi, no reason was provided as to why the decision was made, and Ms. Tuscano never followed up with Ms. Perkins.

***Procedural Failures, Scholarship Deprivation, and Mishandling of Eligibility***

125.    Defendant University failed to provide Plaintiff with access to meaningful grievance procedures or appeal mechanisms when she was removed from the team.  This procedural failure compounded the discrimination and eliminated her ability to fully participate in her educational and athletic programs.

126.    Plaintiff was awarded a full athletic scholarship by the University of Pittsburgh as part of her recruitment to play for the women's basketball team. That scholarship was not merely financial in nature, it represented a contractual promise that included access to educational programs, athletic participation, academic support, and institutional resources.

127.   Plaintiff met all obligations under her scholarship agreement by maintaining academic eligibility, complying with team expectations, and remaining committed to the program.

128.   However, the hostile environment created by Defendant Verdi, coupled with his retaliation after Plaintiff reported concerns, made it impossible for her to continue meaningfully participating in the women's basketball program.

129.   Through retaliatory exclusion from the team leadership, Defendant Verdi rendered Plaintiff's participation impossible. This had the effect of constructively revoking the core benefits of her scholarship without formal process or recourse.

130.   Plaintiff was never afforded a meaningful opportunity to contest her removal from the team or the disruption of her scholarship-related benefits. The University provided no hearing, investigation, or procedural protections, effectively stripping Plaintiff of her educational access and economic resources under the guise of coaching discretion.

131.   The deprivation extended beyond her removal from the team. When Plaintiff applied for a medical hardship redshirt to preserve her eligibility, due to mental health issues directly caused by her treatment within the program, the University submitted inconsistent and incomplete documentation. These procedural failures jeopardized her redshirt application and further deprived her of her future athletic opportunities.

132.   Plaintiff had a reasonable expectation, based on the scholarship agreement, Student-Athlete Handbook, and verbal and written assurances, that she would be provided a safe and non-retaliatory team environment, institutional support, and good-faith eligibility advocacy. The University's failure to fulfill these obligations caused Plaintiff to lose more than her athletic role; it stripped her of promised educational and professional pathways.

*Gender-Based Hostility, Protected Activity, and Retaliation Under Title IX*

133.    The toxic environment within the women's basketball program was marked by gendered expectations, the silencing of female players, and a culture of intimidation.

134.    Defendant Verdi's behavior was not isolated or incidental but part of a broader pattern that affected numerous female athletes and disproportionately impacted Plaintiff due to her visibility and leadership within the team.

135.    Plaintiff engaged in protected activity under Title IX by raising concerns about Defendant Verdi's abusive behavior, including erratic treatment of players, verbal and emotional mistreatment, arbitrary playing time assignments, and the psychologically harmful environment he created.

136.    Plaintiff expressed these concerns to support staff and through both formal and informal athletic department channels, including team meetings, conversations with administrators, and discussions facilitated by her family.

137.    These disclosures placed Defendant University on actual notice of ongoing misconduct. Multiple teammates and family members echoed similar concerns. Nonetheless, the University failed to implement safeguards or initiate corrective action.

138.    Instead of support, Plaintiff experienced escalating retaliation. Defendant Verdi singled her out for criticism, excluded her from leadership roles, manipulated performance evaluations, and ultimately removed her from the team without due process.

139.    The timing and nature of these adverse actions closely followed her protected disclosures, establishing a causal connection between her reports and the retaliation she endured.

140.     These retaliatory measures were sufficiently severe to deter any reasonable student-athlete from further asserting their rights. Plaintiff lost her team role, faced reputational harm, and suffered deep emotional distress that required clinical mental health support.

141.     Players on the team increasingly questioned whether similarly situated male athletes at the University were subjected to comparable retaliation for speaking up. The absence of reports of similar treatment in men's sports, combined with the University's indifference to multiple complaints from women, deepened the perception that female athletes lacked equal protection under University policy.

142.     Male student-athletes at Defendant University simply were not subjected to the same treatment or retaliatory conduct.

143.     The disparity in accountability, support, and due process for female athletes compared to their male counterparts raises serious concerns about gender-based unequal treatment.

144.     Retaliation for reporting sex-based discrimination is itself a form of intentional discrimination under Title IX.

145.     The culture of retaliation further chilled student speech, silenced reporting, and solidified the discriminatory environment in which Plaintiff was expected to operate.

146.     This retaliation was part of a broader pattern observed by other players who dared to speak out.

147.     These retaliatory actions were not based on performance or conduct but were a targeted response to Plaintiff's decision to speak up. Her experience mirrored that of other female athletes, several of whom were forced to transfer under threat of non-renewal of scholarships.

148.    These scholarship threats functioned as a silencing mechanism, used by Defendant Verdi and tolerated by the University to suppress dissent and create compliance through fear.

149.    Multiple student-athletes were pressured to leave the program after expressing dissatisfaction, discomfort, or resistance to the toxic environment.

150.    These departures were not framed as voluntary, but rather as forced exits through intimidation, scholarship threats, or fabricated performance criticisms.

151.    Ms. Perkins's removal from the team and subsequent exclusion from eligibility consideration further illustrates Defendant University's disregard for its duty to safeguard students who speak out.

***Negligent Conduct, Breach of Duty, and Emotional Harm Caused by Defendant Verdi***

152.    As Head Coach of the University of Pittsburgh's women's basketball program, Defendant Verdi held a position of authority and maintained a special relationship with Plaintiff, a vulnerable student-athlete whose academic and athletic future depended on his decisions.

153.    This relationship imposed a duty of care on Defendant Verdi to act responsibly and avoid engaging in conduct that would foreseeably cause emotional or psychological harm.

154.    Despite this duty, Defendant Verdi repeatedly engaged in negligent conduct, including threats to revoke Plaintiff's scholarship without justification, the creation of an emotionally destabilizing environment, and targeted retaliation following Plaintiff's attempts to report the abuse.

155.    Defendant Verdi routinely ignored Plaintiff's medical and emotional needs, used silence and exclusion as disciplinary tools, and made inappropriate and inflammatory statements,

including culturally insensitive and gender based remarks and disturbing declarations regarding self-harm, which contributed to a coercive and toxic team environment.

156.    These actions were especially egregious given the power imbalance inherent in the coach-player relationship and the fact that Plaintiff, like other athletes, had limited recourse without risking her scholarship and academic progress.

157.    Defendant Verdi's behavior foreseeably placed Plaintiff at risk of emotional trauma, which ultimately manifested in severe anxiety, depression, and the need for long-term mental health treatment.

158.    Plaintiff's emotional injuries were the predictable result of prolonged exposure to negligent and harmful conduct by a person in institutional authority.

159.    The nature and intensity of the psychological harm Plaintiff suffered were not speculative, they were a direct consequence of the unsafe environment fostered by Defendant Verdi.

***Failure to Provide Required Title IX Grievance Procedures and Denial of Equitable Process***

160.    Despite Plaintiff's and her family's repeated good-faith efforts to raise concerns about abuse, discrimination, and retaliation through internal University channels, including discussions with athletic department staff and Title IX-adjacent personnel, the University failed to provide her with the procedural protections required under Title IX.

161.    At no point was a formal investigation initiated in response to Plaintiff's disclosures.

162.    Plaintiff was never afforded a hearing, formal review, or meaningful opportunity to respond to the allegations or retaliatory actions that culminated in her removal from the team.

There was no written explanation, no chance to be heard, and no clear appellate or grievance mechanism available to challenge her exclusion.

163.    The absence of transparent and equitable grievance procedures left Plaintiff vulnerable to unchecked mistreatment. The institutional processes available to her were vague, inaccessible, or ineffective. Channels that were supposed to empower student-athletes instead operated to silence and marginalize those who raised legitimate concerns.

164.    As a result of the University's failure to implement and follow required procedural safeguards, Plaintiff was deprived of a fair and equitable process in violation of Title IX. The denial of these protections compounded the harm already inflicted through discrimination and retaliation and further eroded Plaintiff's access to the educational and athletic benefits for which she was recruited.

### *Mishandling of Medical Hardship Waiver and Denial of Redshirt Eligibility*

165.    After her removal, Ms. Perkins remained enrolled at the University and attempted to navigate the emotional fallout while continuing her academic pursuits.

166.    Ms. Perkins experienced worsening mental health symptoms, including depression, anxiety, sleep disturbances, and loss of identity as a student-athlete.

167.    Ms. Perkins began working with a licensed therapist to manage the trauma she had experienced as a result of the abusive team environment and subsequent retaliation.

168.    In the aftermath of her removal, Ms. Perkins's academic performance suffered, and she was left to grieve the loss of the sport that had defined much of her identity.

169.    In an effort to salvage some part of her collegiate athletic career, Ms. Perkins applied for a medical hardship waiver and redshirt status based on her limited participation

during the season and due to the retaliation, emotional and mental health impact of her experience and psychological toll of the abusive environment.

170.     Ms. Perkins's application was initially disregarded by Defendant University.

171.     Only after retaining legal counsel and providing mental health records, a statement from her licensed therapist, and a written narrative did the University submit the request to the Atlantic Coast Conference.

172.     Despite Ms. Perkins's eligibility under NCAA rules and compelling physical and mental health grounds, the process was delayed unnecessarily, jeopardizing her ability to transfer and continue her athletic career.

173.     Ms. Perkins's redshirt application was denied by the Atlantic Coast Conference ("ACC"), not due to factual ineligibility, but rather the University's mishandling of her submission and failure to fully represent her physical and mental health condition, timeline of abuse, and institutional harm.  The submission was incomplete and inconsistent.

174.     Despite being fully aware of the emotional and psychological trauma that Plaintiff experienced as a direct result of her team environment, Defendant University failed to competently or ethically advocate for Plaintiff's medical hardship redshirt waiver. This redshirt status was critical to preserving her remaining athletic eligibility after a year marked by abuse and mental health deterioration.

175.     Moreover, Defendant University's submission included representations that did not align with Ms. Perkins's own statement or the chronology of her counseling and support efforts.

176.     This institutional failure undermined the credibility of Ms. Perkins's hardship request and contributed to its denial.

177.    Rather than working collaboratively with Plaintiff to ensure a complete and accurate submission to the ACC, the University submitted her redshirt packet without confirming the content with her or affording her the opportunity to review it. Plaintiff was not informed what documents were included, whether her treating therapist's letter was part of the record, or how her mental health issues were characterized.

178.    The University's conduct reflected a clear conflict of interest because, as the institution responsible for the conditions that caused Plaintiff's mental health crisis, it was neither impartial nor appropriately positioned to objectively represent her redshirt application. Despite knowing the significance of the waiver to Plaintiff's eligibility, the University failed to advocate zealously or transparently on her behalf.

179.    This procedural failure deprived Plaintiff of a fair opportunity to preserve her NCAA eligibility and pursue her athletic career. By mishandling the process and withholding critical communication, the University exacerbated the emotional harm already inflicted and further violated Plaintiff's rights under Title IX by denying her equal access to redress, protection, and continued athletic participation.

180.    Ms. Perkins's eligibility was not restored, despite clear evidence of legitimate mental health hardship and institutional interference.

181.    As a result, Ms. Perkins has lost a critical year of athletic eligibility, along with the opportunity to transfer to another program and rebuild her athletic reputation.

182.    The damage inflicted was not merely emotional, but academic, reputational, and professional.

***Systemic Institutional Failure and Resulting Title IX Liability***

183.    Ms. Perkins's experience was not an isolated incident but part of a broader systemic failure by Defendant University to monitor, regulate, and respond to the conduct of its coaching staff and the environment they fostered.

184.    As a direct and proximate result of Defendant University's Title IX violations, including the creation of a hostile environment, disparate treatment on the basis of sex, and retaliation, Plaintiff suffered substantial damages, including, but not limited to, emotional distress, reputational harm, medical expenses, loss of eligibility, and the deprivation of educational and athletic opportunities for which she was recruited.

185.    Plaintiff's Title IX claim does not rest on a theory of unequal athletic funding, facilities, or opportunities compared to male athletes. Rather, it arises from the University's failure to prevent, investigate, and remedy the severe, pervasive, and objectively offensive psychological and emotional abuse perpetrated by Defendant Verdi.

186.    Title IX liability attaches where, as here, a federally funded institution is deliberately indifferent to harassment and retaliation that deprives a student of educational access.

## CAUSES OF ACTION

### Count I - Violation of Title IX (20 U.S.C. §§ 1681-1688) - Hostile Educational Environment (Against Defendant University)

187.    Plaintiff realleges and incorporates the preceding paragraphs as though fully set forth herein.

188.    Title IX prohibits discrimination on the basis of sex in any education program or activity receiving federal financial assistance.

189.    The University of Pittsburgh receives federal funding and operates a women's basketball program that is subject to Title IX.

190.    Plaintiff was subjected to a hostile educational environment through persistent emotional, psychological, and discriminatory mistreatment by Head Coach Tory Verdi, including public humiliation, targeted exclusion, retaliation for protected activity, and inappropriate commentary grounded in sex-based stereotypes and gender roles.

191.    Verdi routinely isolated Plaintiff, manipulated her performance data, stripped her of leadership opportunities, and told her she "wasn't liked as a player but would be acceptable to date his son," a statement that dehumanized Plaintiff and reduced her value to traditional gendered expectations.

192.    Verdi's comments and conduct were degrading and contributed to an environment where female athletes were routinely diminished and subjected to emotional instability. Plaintiff's emotional health deteriorated, and her academic performance and athletic progression were significantly compromised.

193.    Defendant University had actual knowledge of the abusive environment and failed to take meaningful action, displaying deliberate indifference in the face of ongoing reports and red flags.

194.    This deliberate failure to address and remedy the hostile conditions denied Plaintiff the benefits of her scholarship and educational opportunity, including meaningful athletic development, mental health safety, and equitable treatment.

195.    Plaintiff's experience reflects broader disparities in how the University addresses complaints within women's versus men's athletic programs.

196.    As a direct and proximate result, Plaintiff suffered damages, including emotional distress, reputational harm, and lost educational opportunities.

## Count II - Violation of Title IX - Retaliation
## (Against Defendant University)

197.    Plaintiff realleges and incorporates the preceding paragraphs as though fully set forth herein.

198.    Plaintiff engaged in protected activity when she reported Coach Verdi's misconduct to University staff, compliance officials, and institutional liaisons.

199.    In response, Verdi retaliated against Plaintiff by reducing her playing time, removing her from leadership roles, manipulating data to justify her marginalization, and ultimately dismissing her from the team.

200.    This retaliation was intended to silence and punish Plaintiff for speaking up, chilling her ability, and that of her peers, to assert rights under Title IX.

201.    The University failed to prevent or mitigate this retaliation, despite being on notice through direct and indirect reports.

202.    Verdi's retaliatory behavior was not isolated; other players who raised concerns were similarly ostracized or forced to transfer in violation of their scholarships.

203.    Plaintiff's removal from the team was not supported by performance or conduct, but rather flowed directly from her protected activity.

204.    As a result, Plaintiff suffered damages, including emotional harm, lost athletic eligibility, academic disruption, and financial hardship.

## Count III - 42 U.S.C. § 1983 - Violation of Fourteenth Amendment Rights (State-Created Danger, Retaliation, Equal Protection)
## (Against Defendant University)

205.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

206.    At all relevant times, Defendant University acted under color of state law and had a constitutional duty not to subject Plaintiff to retaliation or discriminatory treatment.

207.    Plaintiff was placed in a special relationship with Coach Verdi and the University by virtue of her scholarship and status as a student-athlete under their supervision and control.

208.    Defendant Verdi used his institutional authority to inflict psychological abuse and retaliate against Plaintiff for speaking out. He weaponized his role to manipulate, isolate, and humiliate Plaintiff, knowing she was vulnerable and reliant on him for athletic advancement.

209.    Defendant University facilitated this abuse by failing to intervene despite actual knowledge, thereby creating and maintaining a danger that foreseeably resulted in Plaintiff's emotional and academic injury.

210.    Plaintiff was also denied equal protection as female athletes were disproportionately impacted by Verdi's conduct, and Defendant University failed to offer comparable procedural protections or remedies available in other contexts.

211.    The constitutional violations by Verdi, individually, and the University collectively, give rise to liability under 42 U.S.C. § 1983.

212.    Defendant University is liable under 42 U.S.C. §1983 because Plaintiff's injuries were caused by the University's policies, customs, and practices, including deliberate indifference to known coaching misconduct, failure to supervise and discipline athletic personnel, and ratification of Defendant Verdi's retaliatory actions.  These policies and customs were the moving force behind the constitutional violations inflicted upon Plaintiff.

**Count IV - 42 U.S.C. § 1983 - Individual Liability of Coach Tory Verdi (Fourteenth Amendment Violations: State-Created Danger, Retaliation, Equal Protection) (Against Defendant Verdi)**

213.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

214.    At all relevant times, Defendant Verdi acted under color of state law and exercised state-delegated authority over Plaintiff's participation in the University's women's basketball program, including Plaintiff's athletic standing, scholarship-related benefits, playing time, team inclusion, and access to educational opportunities.

215.    Defendant Verdi is sued in his individual capacity for damages arising from his personal participation in constitutional violations actionable under 42 U.S.C. § 1983.

216.    Defendant Verdi affirmatively used his authority to create, escalate, and maintain a coercive and psychologically unsafe environment, including public humiliation, emotional degradation, intimidation, retaliation, and scholarship-based threats. Defendant Verdi's actions foreseeably placed Plaintiff in a position of heightened vulnerability and danger, and exposed Plaintiff to a foreseeable and substantial risk of psychological harm and educational disruption.

217.    Defendant Verdi acted with deliberate indifference to Plaintiff's safety and well-being by engaging in and perpetuating conduct that was objectively unreasonable under the circumstances and that foreseeably caused severe emotional distress, deterioration of mental health, and loss of educational and athletic opportunity.

218.    Plaintiff engaged in protected activity by reporting and/or opposing misconduct, discrimination, retaliation, and the hostile environment within the women's basketball program.

219.    Defendant Verdi retaliated against Plaintiff for engaging in protected activity by taking materially adverse actions, including but not limited to, marginalization, exclusion, targeted scrutiny, manipulated performance assessments, scholarship-related threats, and

constructive removal from the program. These actions would deter a reasonable student-athlete from engaging in protected conduct.

220.    Defendant Verdi intentionally subjected Plaintiff and similarly situated female student-athletes to discriminatory and unequal treatment, hostility, humiliation, and retaliatory coercion, without legitimate justification, thereby denying Plaintiff the equal protection of the laws guaranteed by the Fourteenth Amendment.

221.    Defendant Verdi used his state-delegated authority and position of control to cause and effectuate the deprivation of Plaintiff's scholarship-related benefits and athletic participation without fair notice, transparency, or meaningful opportunity to contest the decision. Defendant Verdi's conduct, including scholarship coercion and forced removal mechanisms, resulted in a deprivation of Plaintiff's protected interests and contributed to Plaintiff's constructive expulsion from the program.

222.    Defendant Verdi's conduct was willful, malicious, and in reckless disregard of Plaintiff's clearly established constitutional rights. Defendant Verdi is therefore individually liable to Plaintiff for compensatory damages, punitive damages, attorneys' fees, and costs pursuant to 42 U.S.C. §§ 1983 and 1988, and all other relief the Court deems just and proper.

### Count V - Breach of Contract / Deprivation of Property Interest (Scholarship) (Against Defendant University)

223.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

224.    Plaintiff was awarded an athletic scholarship as a contractual exchange for participation in the women's basketball program, academic compliance, and athletic contribution.

225.    Plaintiff fulfilled her obligations. Her dismissal from the team, without process or explanation, constituted a breach of that agreement and deprived her of the financial and educational benefits guaranteed by the scholarship.

226.    Plaintiff's athletic scholarship constituted a contractual agreement between Plaintiff and Defendant University, pursuant to which Plaintiff agreed to maintain eligibility, comply with team and academic obligations, and participate as a student-athlete, in exchange for scholarship-related educational benefits, athletic participation, and institutional support.

227.    Plaintiff fulfilled her obligations under the scholarship agreement.

228.    Defendant University breached its contractual obligations and deprived Plaintiff of scholarship-related educational benefits by permitting and effectuating Plaintiff's constructive exclusion and/or removal from meaningful participation without fair procedures, transparency, or adherence to University policies and the Student-Athlete Handbook.

229.    As a direct and proximate result, Plaintiff suffered damages including loss of educational and athletic opportunity, financial harm, and emotional distress.

## Count VI - Intentional Infliction of Emotional Distress
### (Against Defendant Verdi, Individually)

230.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

231.    Verdi's conduct was extreme, outrageous, and intended, or recklessly certain, to cause emotional harm.

232.    His actions included belittling Plaintiff in front of her teammates, publicly stating he wanted to kill himself because of the team, manipulating her performance statistics, retaliating for protected reports, and isolating her emotionally and physically.

233.    These acts exceeded the bounds of decency, especially given the power dynamics between coach and player.

234.    Plaintiff experienced severe emotional harm, requiring clinical intervention, and suffered long-term mental and emotional consequences.

### Count VII - Negligent Infliction of Emotional Distress
### (Against Defendant University)

235.    Plaintiff realleges and incorporates all preceding paragraphs as if fully set forth herein.

236.    The University owed a duty of care to Plaintiff as a student-athlete in its custody, particularly where it was aware of ongoing complaints and emotional distress.

237.    This duty was breached through failure to supervise, investigate, or intervene despite multiple reports of abuse.

238.    The University's negligence placed Plaintiff in foreseeable emotional and psychological danger, resulting in medically documented trauma and academic disruption.

239.    Plaintiff's injuries were preventable had appropriate safeguards and oversight been implemented.

### Count VIII - Violation of Title IX (Denial of Equitable Process/Inequitable Institutional Response) *(20 U.S.C. § 1681)*
### (Against Defendant University)

240.    Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

241.    Title IX requires recipients of federal financial assistance to respond promptly and equitably to complaints and reports of sex-based harassment, retaliation, and hostile educational environments, including by providing meaningful grievance processes, investigations, protective measures, and remedies.

242.    Following Plaintiff's removal from the team and during the redshirt eligibility appeal process, Plaintiff was denied access to fair and equitable grievance procedures and meaningful institutional review.

243.    Defendant University failed to provide a prompt and equitable response, including failing to conduct a formal investigation, provide transparent findings, offer a meaningful hearing or independent review, or implement protective measures to prevent continued retaliation and harm.

244.    Upon information and belief, similarly situated student-athletes outside the women's basketball program were routinely afforded greater procedural protections and institutional advocacy in disciplinary and eligibility-related matters, highlighting a gender-based disparity.

245.    This denial of equitable process and inequitable institutional response reflects a violation of Title IX and its implementing regulations, and deprived Plaintiff of equal access to educational and athletic opportunities.

**Count IX  - Violation of Title IX (Redshirt/Eligibility and Institutional Conflict)**
***(20 U.S.C. § 1681)***
**(Against Defendant University)**

246.    Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

247.    Plaintiff applied for a medical hardship redshirt due to mental health struggles caused by her treatment under Coach Verdi.

248.    The University submitted inaccurate and misleading information to the ACC/NCAA that conflicted with Plaintiff's medical records and personal statement.

249.    This undermined Plaintiff's appeal and reflected institutional bias, given the University's interest in avoiding liability and reputational damage.

250.    Plaintiff's eligibility was denied, not based on merit or medical evidence, but because of institutional conflict and procedural irregularities.

### Count X - Negligent Hiring, Retention and Supervision
### (Against Defendant University)

251.    Plaintiff realleges the foregoing paragraphs as if fully set forth herein.

252.    The University had a duty to ensure that coaches entrusted with student-athletes were competent, emotionally stable, and fit for their role.

253.    Prior to hiring Verdi, the University failed to conduct adequate due diligence into his prior conduct.

254.    During his tenure, the University ignored red flags, complaints, and evidence of psychological abuse toward multiple players.

255.    Its failure to supervise or discipline Verdi allowed a toxic culture to flourish, directly causing Plaintiff's injuries.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Isabella Perkins respectfully requests that this Court enter judgment in her favor and against Defendants, and grant the following relief:

**A.  Declaratory Relief**

- A declaration that the Defendant University violated Title IX by subjecting Plaintiff to a hostile educational environment, unlawful retaliation, and denial of equitable grievance procedures and eligibility protections;
- A declaration that Defendant University, acting under color of state law, violated Plaintiff's rights under the Fourteenth Amendment to the United States Constitution, as actionable through 42 U.S.C. § 1983;

- A declaration that Defendant Verdi, in his individual capacity, violated Plaintiff's constitutional rights through state-created danger, retaliation for protected conduct, and discriminatory treatment in violation of the Equal Protection Clause.

**B. <u>Injunctive Relief</u>**

- An order requiring the Defendant University to remove any and all disciplinary notations, references to team dismissal, or adverse documentation related to Plaintiff's participation in the women's basketball program from her academic, athletic, and compliance records;
- An order compelling the University to submit (or resubmit) all appropriate documentation to the Atlantic Coast Conference (ACC) and/or the NCAA to certify Plaintiff's eligibility for a medical hardship waiver (i.e., redshirt) for the 2024–2025 season;
- An order restoring Plaintiff's full athletic eligibility for the 2024–2025 season, and mandating Defendant University to advocate for her redshirt eligibility in good faith;
- An order enjoining Defendant University and its agents from engaging in further retaliation against Plaintiff or any other students who report discrimination or abuse;
- An order mandating institutional reforms, including the adoption of clear and enforceable protections for student-athlete mental health and due process in grievance procedures.

**C. <u>Compensatory Damages</u>**

- An award of compensatory damages in an amount to be determined at trial for emotional distress, mental anguish, reputational harm, educational disruption, lost scholarship benefits, medical expenses, and other economic and non-economic losses.

**D. <u>Punitive Damages</u>**

- An award of punitive damages against Defendant Verdi in his individual capacity for willful, malicious, and recklessly indifferent conduct, in an amount sufficient to punish and deter similar future conduct.

**E. <u>Attorneys' Fees and Costs</u>**

- An award of reasonable attorneys' fees, expert witness fees, and litigation costs pursuant to 42 U.S.C. § 1988, and any other applicable authority.

**F.  <u>Other Relief</u>**

- Any other relief that this Court deems just, equitable, or proper under the circumstances.

Respectfully submitted,

Date: <u>February 6, 2026</u>

Keenan Holmes, Esquire
PA ID #204520
Ebony Law, LLC

213 Smithfield Street
Pittsburgh, PA 15222

724.263.7530
kh@ebonylaw.com